## National Grid USA *vs.* TransCanada Power Marketing Ltd.

No. 05-P-1608.

Suffolk. May 4, 2006. - January 4, 2007.

Present: Perretta, Dreben, & Vuono, JJ.

*Public Utilities,* Sale of electric power. *Arbitration,* Confirmation of award.

In proceedings in Superior Court to confirm an arbitration award in a dispute concerning the proper allocation of certain costs incurred in the wholesale and retail distribution of electricity under a contract between the plaintiff and the defendant, the defendant failed to demonstrate that the judge exceeded the scope of his authority by expanding the scope of the award to apply to matters not specifically decided or submitted to arbitration. [36-38]

Civil action commenced in the Superior Court Department on March 24, 2003.

The case was heard by *John C. Cratsley,* J.

*Daniel C. Winston (Wendy S. Plotkin* with him) for the defendant.

*David H. Erichsen (Timothy Ngau* with him) for the plaintiff.

Perretta, J. This appeal involves a dispute between Trans-Canada Power Marketing Ltd. (TransCanada), a wholesale power distributor, and National Grid USA (National Grid). Pursuant to three separate wholesale power contracts, Trans-Canada delivers power to affiliates of National Grid, which then sell it to their retail customers. When a dispute arose between National Grid and TransCanada under their contracts concerning the proper allocation of certain costs incurred in the wholesale and retail distribution of power, they proceeded to a three-member arbitration panel. In a majority decision, the panel made an award in National Grid's favor. Upon subsequent proceedings in the Superior Court, a judge remanded the matter to the three-member panel for clarification of their decision. In

their clarified decision, a majority of the panel again allocated the disputed costs to TransCanada. A second Superior Court judge affirmed in part and vacated in part the award as set out and explained in the panel's clarified decision. On appeal, Trans-Canada argues that the panel and the judge after remand exceeded the scope of their authority.[1] We affirm the judgment.

1. *Background.* TransCanada, an energy wholesaler, has contracted to provide electrical energy to three affiliates of National Grid, an energy retailer. The affiliates in turn provide energy to individual retail customers throughout the State. The three contracts between TransCanada and the National Grid affiliates are (1) the Amended and Restated Wholesale Standard Offer Service Agreement II (the "MECO agreement") of September 1, 1998, between the Massachusetts Electric Company, the Nantucket Electric Company, and USGen New England, Inc. (USGen)[2]; (2) the Amended and Restated Wholesale Standard Offer Service Agreement II (the "NECO agreement") of September 1, 1998, between the Narragansett Electric Company and USGen[3]; and (3) the Wholesale Standard Offer Service Agreement (the "Blackstone agreement"), dated April 7, 1998, between the Blackstone Valley Electric Company, the Eastern Edison Company, the Newport Electric Corporation, and TransCanada.

TransCanada's contracts with all three affiliates provide that TransCanada has sole discretion to decide where it will deliver energy to the retail affiliates (the "delivery points"). Massachusetts is divided into three delivery zones: (1) Northeastern Massachusetts, including Boston (the "Northeast zone," covered by the NECO agreement); (2) Western and Central Massachusetts (the "West Central zone," covered by the Blackstone agreement); and (3) Southeastern Massachusetts (the "Southeast zone," covered by the MECO agreement). Notwithstanding the fact that the retail affiliates' customers are located throughout the State, TransCanada has selected a single delivery point for

[1]National Grid did not appeal from the judge's partial vacation of the award. See part 3.d, *infra.*

[2]As pertinent to the dispute, USGen assigned portions of its wholesale standard offer obligations on the MECO and NECO agreements to TransCanada.

[3]See note 2, *supra.*

all three contracts, located in the Southeast zone. After the energy is received at the delivery point, the National Grid affiliates must then transmit the energy to their retail customers throughout the State.

In September, 2002, the Federal Energy Regulatory Commission approved rules pertaining to multi-zonal pricing structures (the "congestion management system" or "CMS"), designed to provide wholesale electrical power through a competitive bid system so that only the most economically priced power would be dispatched. TransCanada initiated this arbitration in order to determine who would be responsible for certain "congestion charges" under the new system (ultimately implemented in March, 2003).

2. *The dispute.* Certain definitions are necessary to an understanding of the dispute. The word "congestion" refers to limitations in the New England transmission system that prevent electric power from being delivered to customers from a least-cost source of power. "Congestion costs" come into play when, due to limitations in transmission capacity, the least-cost source must be bypassed, and a higher-cost generating unit is used instead. The difference between the cost in using the two units is the "congestion cost."[4]

The term "upstream" congestion costs has been used to mean those costs that arise between a "generation point" (the point where TransCanada's power originates) and a delivery point.

It is the term "downstream" congestion costs that is disputed

---

[4]A witness for National Grid illustrated the concept of congestion costs as follows:

"There are times when there are transmission limitations that prevent power moving from one generating location to an area where load is located. If, for example, we just split Massachusetts into two areas, the western part and then the Boston area, if . . . the next-least-expensive generating unit is located in western Massachusetts but by turning it on we can't serve load in downtown Boston because we do not have enough transmission capacity to wheel that power, then . . . in order to maintain reliability of the system [we] will skip over that least-cost unit and take a higher-cost generating unit located in Boston . . . and pay a slightly higher price for that dispatch . . . . And that [cost] is flagged and the costs above the economic dispatch are classified as congestion costs."

by the parties. National Grid has maintained throughout these proceedings that "downstream" congestion costs encompass *all* congestion costs accruing between the delivery point and retail customers. TransCanada did not argue otherwise at the initial proceedings before the arbitration panel. However, commencing with the proceedings on remand to the panel, TransCanada has argued that the term "downstream" congestion costs refers only to those costs accruing between the delivery point and retail customers located within the same zone as the delivery point (here, the Southeast zone); TransCanada argues that costs accruing between the delivery point and retail customers in zones outside the delivery point (i.e., the Northeast zone, which includes Boston, and the West Central zone) constitute a third category of costs, that is, "other" congestion costs.

3. *The arbitration proceedings.* Anticipating a dispute with National Grid upon the imminent implementation of the congestion management system (CMS) program, TransCanada wrote to one of National Grid's affiliates on May 2, 2002, and described its disagreement with National Grid as follows:

> "Under [the prospective CMS] pricing model, congestion charges will apply from time-to-time on various parts of the system. The question is: which party is responsible under the agreements for those charges when they arise?"

When TransCanada and National Grid were unable to resolve their differences about the allocation of congestion costs, they proceeded to arbitration as they were contractually obligated to do.

a. *The initial arbitration proceedings.* In their pre-arbitration stipulation, National Grid and TransCanada agreed that the sole issue to be determined was their respective responsibility for congestion costs downstream of the contract delivery points. To be more precise, the stipulation reads in relevant part:

> "WHEREAS, TransCanada and National Grid desire to obtain a decision in this arbitration which will specify each party's responsibility under each of the Contracts for congestion costs downstream of the contractual delivery points following the implementation, contemplated to oc-

cur on or about January 1, 2003, within the New England
Management Pool . . . of a Congestion Management
System . . . and

    "   . . .

"2. . . . . The parties . . . agree that the arbitration
panel . . . is authorized to arbitrate the dispute between
the Parties that has arisen under each of the Contracts as
described in Paragraph 5 hereof[.]

    "   . . .

"5. For each of the Contracts, the arbitration panel's
final decision shall separately specify whether TransCanada
or one or more of the National Grid entities shall be
responsible for congestion costs downstream of the
contractual delivery points specified in the applicable
Contract."

At arbitration, TransCanada took the position that its obliga-
tion under the contracts to pay congestion costs ends when it
delivers power to the contract delivery point (i.e., the upstream
congestion costs). National Grid claimed that TransCanada is
obligated to pay congestion costs irrespective of whether those
costs are incurred in delivering power to the delivery point or in
delivering power beyond that point, to the location of the retail
customers of National Grid's affiliates.[5]

On January 31, 2003, a majority of the three-member arbitra-
tion panel issued their decision holding TransCanada responsible
for "congestion costs . . . both before and after the . . .
delivery point" and "for the congestion costs downstream of
the contractual delivery point" specified in each of its contracts.

b. *The remand order.* In March, 2003, National Grid filed a

---

[5]For example, Michael J. Hager, called by National Grid, testified as fol-
lows: "So what we're suggesting is to the extent we have customers in
Boston that you [TransCanada] are serving under that supplier arrangement
and you elect to deliver power in [the Southeast zone] because there is an
economic advantage to you . . . that we weren't going to get stuck with the
cost of congestion-related costs when it was delivered to where our customers
were located. So what we're saying is if you want to put it in there and we
need to get that power across . . . to where our customers are located in
Boston, you, the supplier, will be responsible for that cost."

complaint in Superior Court seeking to confirm the award, and TransCanada counterclaimed. After a hearing, a Superior Court judge determined that the parties disagreed as to what was actually decided by the arbitration panel. Therefore, in January, 2004, over TransCanada's objection, the judge requested the panel to clarify their original award, submitting to the panel specific questions the parties had formulated upon her request.[6] See G. L. c. 251, § 9.

c. *The proceedings on remand.* On July 15, 2004, the same panel, one arbitrator again dissenting, issued a twenty-seven page clarified decision further explaining their earlier determination that responsibility for all congestion costs rested with Trans-Canada, "whether incurred before or after the Delivery Point." In their decision on remand, the panel expressed the view that in order to comply with the remand order they were "required to review [their] responsibilities, scope, authority, and the issue presented to them in the proceeding resulting in [the original decision]." The panel limited their consideration to the record from the original arbitration proceeding along with the parties' briefs, oral arguments, and discussions on remand.

In their clarified decision of July 15, 2004, the panel stated that the issue put before them for arbitration in the original proceeding was "who was responsible for congestion costs under the Agreements." Responding to TransCanada's argument that there were three categories of congestion costs, that is, "upstream," "downstream," and "other," the panel noted that TransCanada was making this argument for the first time on remand, and cited numerous instances in the record of the

---

[6]Pursuant to National Grid's request, the judge asked the panel: (1) Is Trans-Canada responsible for congestion costs arising from the difference in price between the zone in which the contractually designated delivery point is located and other zones in which National Grid's retail customers are located? and (2) Is TransCanada responsible for congestion costs regardless of whether those costs arise before or after the delivery point?

The judge also asked, as requested by TransCanada: (1) Was the panel authorized to consider anything more than the issue of the allocation of downstream congestion costs between the parties? and (2) Was the panel authorized to determine whether (what TransCanada began to call "other" congestion costs) are in fact "downstream" congestion costs and/or whether TransCanada would be responsible for such costs if it were determined that they were not "downstream" congestion costs?

original proceeding where TransCanada had framed the issue as a more general question concerning responsibility for congestion costs "beyond" or "after" the delivery point, these terms being used interchangeably with the term "downstream." The panel thus rejected TransCanada's contention that the only issue to be decided on remand was whether TransCanada was responsible for "downstream" congestion costs as newly narrowly defined, and its contention that the panel lacked the authority to make a finding that TransCanada was responsible for any other congestion costs. The panel also rejected Trans-Canada's claim that the panel's authority was limited by paragraph five of the parties' stipulation.

In response to the questions put to them on remand, the panel explained that they had made no finding as to what constituted congestion costs. Rather, they had determined only who was responsible for congestion costs, that is, upstream and downstream congestion costs, and again stated that "[n]o other costs or breakdown of congestion costs were identified." The panel also answered that they had been asked and were authorized to determine which party, National Grid or Trans-Canada, was responsible for congestion costs under each of the contracts. Lastly, the panel noted that, because TransCanada accepted responsibility for congestion costs incurred prior to the delivery point, the original arbitration proceeding had focused on downstream congestion costs. The panel concluded their clarified decision by stating:

> "It was and remains the conclusion and finding of the Panel's majority that TransCanada is responsible under the Agreements for congestion costs. The Panel made no other finding. It did not distinguish for the purpose of answering the question before it between upstream, downstream or other congestion costs. Upstream congestion costs were admitted and accepted by TransCanada. The Panel found that TransCanada under the Agreement was responsible for congestion costs, which meant it was responsible not just for upstream congestion costs, which it accepted initially in the hearings, but also for downstream congestion costs. No other costs or breakdown of congestion costs were identified. If the Panel at this time goes further as to what

is covered by the term 'congestion costs,' it would be going beyond the scope of the issue presented to it at the arbitration proceeding.

"The Panel wishes to note again in this Conclusion that the Panel majority reconfirms its Decision and Award of January 31, 2003 and incorporates that Decision and Award as a part of this Clarification on Remand of Panel Award dated July 15[,] 2004."[7]

d. *The Superior Court decision.* At the Superior Court, Trans-Canada adhered to its argument before the arbitration panel on remand, and moved to confirm the award insofar as it held TransCanada responsible for the newly defined "downstream" costs, and to vacate the award as in excess of the panel's authority, insofar as it held TransCanada liable for "upstream" and "other" costs. The Superior Court judge concluded that the panel's consideration of upstream congestion costs was beyond the scope of the arbitration, and vacated the award with respect to upstream congestion costs.[8] The judge confirmed the award in all other respects, holding that the arbitration panel had in fact subsumed "other" costs within "downstream" congestion costs, and had not exceeded their authority in doing so.

On appeal to this court, TransCanada now argues that the arbitration panel did not define "downstream" costs, and that, therefore, the Superior Court's decision, by including "other" within "downstream," actually interpreted or modified the award rather than simply confirming the award in part, and thus the judge's decision exceeded the scope of his authority.

---

[7]The third panel member concurred in part and dissented in part. Citing, inter alia, par. five of the parties' stipulation, he dissented from the panel majority's view that they had been asked to determine responsibility for upstream congestion costs. (This aspect of the panel's award was ultimately vacated by the Superior Court judge.) As to downstream costs, the dissenting member concluded, as he had in the initial arbitration decision, that National Grid, rather than TransCanada, was responsible for all congestion costs beyond the delivery point. However, he agreed with the majority's conclusion on remand that the "existence of some type of congestion costs that were not encompassed in downstream or upstream congestion costs" was not the subject of the arbitration.

[8]No appeal was taken from the portion of the judgment vacating the panel's allocation of upstream congestion costs.

4. *Discussion.* A review of the arbitration proceedings and the panel's decisions shows that the panel used the term "downstream" to mean any costs arising after or beyond the delivery point irrespective of where the retail customer is located or where TransCanada physically delivers the energy. The record also shows that both National Grid and TransCanada accepted this meaning of "downstream" congestion costs used by the panel, that is, all non-upstream costs, i.e., all costs arising after or beyond a delivery point.

By way of example and in addition to those facts previously set out, counsel for TransCanada, in his opening statement at the first arbitration hearing, stated:

> "TransCanada's position is that it is responsible for congestion costs that arise up to the contractual delivery points. TransCanada's position is that it is not responsible under the terms of the contracts for congestion costs that arise *after* it has made delivery to the National Grid subsidiaries at the contractual delivery points" (emphasis supplied).

In its posthearing brief, TransCanada framed the question before the arbitration panel as follows:

> "The narrow question that the parties seek to arbitrate is: Under each of the three agreements, which party . . . should bear responsibility for congestion costs that arise *after* TransCanada delivers power to the National Grid subsidiary at an acceptable delivery point under the Contract" (emphasis supplied).

TransCanada concluded its posthearing brief by stating:

> "TransCanada asks that the Panel rule that under each of the three agreements, TransCanada's responsibility for congestion costs terminates at the contractual delivery points and that the National Grid subsidiaries are responsible for all congestion costs that arise *beyond* the contractual delivery points" (emphasis supplied).

As earlier related, it was not until the request for clarification that TransCanada claimed, as it continues to do, that the defini-

tion of "downstream" has been disputed by the parties throughout the arbitration and subsequent litigation. We can find nothing in the record before us to support TransCanada's contention. To the contrary, our review of the record establishes that the parties and the panel shared an understanding that the meaning of the term "downstream congestion costs" included the so-called "other" congestion costs. In short, TransCanada acknowledged throughout the arbitration proceedings that all congestion costs subsequent to or beyond a delivery point were "downstream" congestion costs.

Despite substantial evidence that no differentiation was made between so-called "other" congestion costs and "downstream" costs throughout the initial arbitration, TransCanada urges that we conclude that either the panel did not define "downstream" or that the term signified only *some* non-upstream congestion costs. As support for this position, TransCanada misreads the panel's statement that they "did not distinguish . . . between upstream, downstream or other congestion costs" and asserts that it is proof that the panel acknowledged three distinct categories of costs with each requiring a separate adjudication of responsibility. Read in its proper context without parsing or suggested subtleties, the panel's statement was simply an explanation for why they had considered only two categories of costs, "upstream" and "downstream." As repeatedly stated, "other" congestion costs was not a category of costs that was raised or defined during the arbitration proceedings.

Having determined that the term "downstream" congestion costs, as used by the parties and the panel, included all congestion costs arising after or beyond the delivery point, we come to the decisive issue presented in this appeal, that is, did the Superior Court judge's decision after the panel's clarified decision reflect the panel's meaning of "downstream" or did the judge impermissibly modify the meaning of that term?

In reviewing an arbitration award, a court may neither "attempt to revisit the merits" of the award, nor make changes to the award that affect the substantive rights of the parties. See, e.g., *Dadak* v. *Commerce Ins. Co.*, 53 Mass. App. Ct. 302, 306 n.7 (2001), quoting from *Hough* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 757 F. Supp. 283, 289 (S.D.N.Y. 1991). For

the following reasons, we conclude that the judge after remand neither attempted to revisit the merits of the panel's award nor impermissibly modified it. In so concluding, we respond to each of TransCanada's challenges.

TransCanada claims that the judge exceeded his authority by making factual findings of his own to support his conclusion that the panel subsumed "other" congestion costs into their allocation of responsibility for downstream costs, and that he "expand[ed] the scope of the award to apply to matters not specifically decided or submitted to arbitration." However, a fair and reasonable reading of the judge's memorandum of decision shows that the judge kept to the arbitrators' decision in describing the history of the parties' dispute concerning "other" congestion costs and the manner in which the panel resolved the dispute. We agree with his conclusion that it was reasonable for the panel "to subsume the 'other' congestion costs into the downstream congestion costs category." Contrast *Lynn* v. *Thompson*, 435 Mass. 54, 65 (2001), cert. denied, 534 U.S. 1131 (2002) (Superior Court judgment vacating arbitrator's award reversed where judgment based on facts rejected by arbitrator).

In the instant case, the judge affirmed the panel's determination that no subcategories of costs were presented, litigated, or decided during the first arbitration proceeding and that "other" costs actually had been litigated and decided under the broader category of "downstream" costs. He did not, as TransCanada contends, "expand the scope of the award to apply to matters not specifically decided or submitted to arbitration."

5. *Conclusion.* Both TransCanada and National Grid stress the importance of arbitration as an efficient process by which a final decision may be reached without court interference. We agree. See *Maltz* v. *Smith Barney, Inc.*, 427 Mass. 560, 563 (1998). Nonetheless, it has been almost four years since the panel's decision in the original arbitration. During those initial proceedings, it was TransCanada's obligation to bring to the attention of the panel any meaningful distinctions between allegedly different types of downstream congestion costs. Having failed to do so, TransCanada cannot now seek to relitigate the

dispute by labeling the judge's decision after remand an erroneous modification of the panel's award.[9]

*Judgment affirmed.*

---

[9]Given what we have said, there is also no merit to TransCanada's argument in the alternative, that if the arbitration panel did make an award regarding "other" congestion costs, the panel exceeded their authority.